IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

JEFFREY A. MYERS                                                                    PLAINTIFF

v.                                    Civil No. 10-2067

MICHAEL J. ASTRUE, Commissioner of
Social Security Administration                                                      DEFENDANT

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

**I.      Factual and Procedural Background**

Plaintiff, Jeffrey A. Myers, appeals from the decision of the Commissioner of the Social Security Administration ("Commissioner") denying his application for disability insurance benefits ("DIB"), pursuant to §§ 216(i) and 223(d) of Title II of the Social Security Act, 42 U.S.C. §§ 416(i) and 423(d) ("the Act").

Plaintiff protectively filed his DIB application on May 7, 2007, alleging an onset date of July 10, 2006, due to diabetes mellitus, hearing loss, hypertension, peripheral vascular disease, vision problems, kidney problems, stroke with paralysis on his right side, pain, and amputations of both his legs to the knee.[1]  Tr. 48-51, 55, 135-137, 170, 216.  Plaintiff's date last insured was December 31, 2006.  Tr. 61.  At the time of the alleged onset date, Plaintiff was forty eight years of age with a high school education and one year of college.  Tr. 22, 60, 167, 177, 216.  He performed past relevant work as a restaurant manager, merchandise deliverer, and meat processing supervisor.  Tr. 36-42,

---

[1] Plaintiff filed a concurrent application for supplemental security income on May 7, 2007.  Tr. 49, 51, 65-68, 76-82, 143-146.  His application was initially denied, but was subsequently granted on reconsideration on January 14, 2008.  Tr. 76-82.  Plaintiff was found disabled for SSI purposes as of May 2007.  Tr. 76-82.

171-172, 181-188, 216.

Plaintiff's applications were denied at the initial and reconsideration levels. Tr. 62-64, 71-72. At Plaintiff's request, an administrative hearing was held on October 31, 2008. Tr. 19-47. Plaintiff was present at this hearing and represented by Troy Rash, Jr., an attorney. Tr. 19-47. The Administrative Law Judge ("ALJ") rendered an unfavorable decision on February 10, 2009, finding Plaintiff was not disabled within the meaning of the Act. Tr. 52-61. Subsequently, the Appeals Council denied Plaintiff's Request for Review on March 18, 2010, thus making the ALJ's decision the final decision of the Commissioner. Tr. 1-3. Plaintiff now seeks judicial review of that decision.

## II.  Medical History

Plaintiff has a history of Type II insulin-dependent diabetes mellitus, peripheral vascular disease, hypertension, amputations of the right fourth toe and left leg below the knee, and hearing loss. In February 2001, Plaintiff was admitted to Sparks Regional Medical Center for amputation of his right fourth toe due to a diabetic-related gangrenous abscess, which was performed successfully and without incident. Tr. 220-235.

In April 2001, Plaintiff presented to Arkansas Center for ENT and Allergy for an audiologic evaluation. Tr. 361-365. A hearing loss test revealed a speech reception threshold ("SRT") of 90 decibels in the right ear and 65 decibels in the left ear, indicating severe to profound mixed hearing loss in the right ear and severe mixed hearing loss in the left ear. Tr. 361. At this time, Plaintiff wore hearing aids. Tr. 363. Michael A. Marsh, M.D., recommended that Plaintiff consider a right stapedectomy to improve hearing loss in the right ear. Tr. 363.

Plaintiff was incarcerated between 2001 and 2007. Tr. 261. While incarcerated at Bonne Terre Penitentiary, he received medical care from Carl Doerhoff, M.D. Tr. 236-258. In May 2006,

Plaintiff had swelling of his left leg and a gangrenous ulcer on his left fourth toe, for which he was given compression stockings and antibiotics. Tr. 236-238. X-rays of Plaintiff's left foot revealed a healed fracture deformity of the midshaft of the fifth metatarsal (consistent with a prior fracture), but the remaining bony structures and articular spaces were intact. Tr. 236. There was no specific evidence of osteomyelitis involving the fourth digit, although there were hypertrophic degenerative changes noted at the dorsal surface of the mid-foot and an enthesophyte evidenced at the posterior margins of the calcaneus. Tr. 236. There was also some evidence to suggest vascular calcinosis of the posterior tibial arteries. Tr. 236.

On June 2, 2006, Plaintiff's fourth left toe and left foot were dark purple to black in color. Tr. 240. A triple-phase bone scan revealed osteomyelitis of the dorsal aspect of the mid-foot and minimal activity of the fourth metatarsal head. Tr. 243. An arterial Doppler scan revealed significant left-sided aortoiliac stenosis/occlusion, with similar but not as marked findings within the right aortoiliac region. Tr. 244. Multiple segments of stenosis/occlusion were also noted within the remaining vasculature of the lower extremities bilaterally. Tr. 244.

On June 20, 2006, Dr. Doerhoff assessed Plaintiff with medium and small artery peripheral vascular disease (atherosclerosis plus diabetes) with ischemic necrosis of the left fourth toe and possible osteomyelitis within the dorsum of the foot. Tr. 249. He recommended an arteriogram and consideration for revascularization. Tr. 249. An abdominal aortogram with runoff revealed severe bilateral peripheral vascular occlusive disease. Tr. 250-251. In the right foot, there was a long segment of chronic occlusion of the right superficial femoral artery, with the patent portions severely diseased. Tr. 251. In the left foot, the superficial femoral artery was severely diseased and demonstrated multiple focal stenosis in tandem, with the most severe area within the distal

superficial femoral artery. Tr. 251. An atherectomy was performed, which significantly improved the distal superficial femoral artery. Tr. 251. However, due to ischemic necrosis of the lower leg, Dr. Doerhoff recommended amputation of the left leg below the knee, which was performed on July 10, 2006. Tr. 252-258. At a follow-up appointment on August 2, 2006, Dr. Doerhoff noted that the wound looked good with no gaping or discharge. Tr. 272. However, Plaintiff developed a methicillin-resistant staphylococcus aureus ("MSRA") infection, for which he was treated with Septra. Tr. 267-273, 305-306. On August 5, 2006, Plaintiff stated that he was "doing pretty good." Tr. 281. On August 8, 2006, Marcos C. Nalagan, M.D., noted that Plaintiff's stump looked good, with no drainage or erythema. Tr. 296. Progress notes reveal that Plaintiff's stump was healing well, although there was a superficial ulceration and a small amount of drainage, but no swelling or tenderness. Tr. 297. Plaintiff was given shrinker socks to reduce and prevent swelling. Tr. 304. On September 22, 2006, Plaintiff was fitted for a prosthesis. Tr. 302. He was also given a walker. Tr. 314. On September 25, 2006, there was a small unhealed open area at the center of Plaintiff's stump, and Septra was restarted. Tr. 314. In October 2006, adjustments were made to Plaintiff's prosthesis to improve gait. Tr. 315.

     On September 9, 2006, Plaintiff complained of left-sided numbness and drooping of his left eye. Tr. 309. He denied difficulty speaking, visual problems, dizziness, nausea, vomiting, weakness and difficulty ambulating. Tr. 310. Upon examination, Plaintiff was alert and oriented times three. Tr. 310. His speech was normal. Tr. 310. Mild diabetic retinopathy was noted, but no neurological deficits were observed. Tr. 310. He was given Clonidine. Tr. 310. On October 4, 2006, Plaintiff fell in his cell and complained of left-sided numbness. Tr. 315-316. X-rays of his cervical spine revealed moderately advanced degenerative changes of the cervical vertebral segments at C4, C5,

C6, and to a lesser degree, C7, and an incidental finding of vascular calcinosis. Tr. 316-317. Upon examination, Dr. Nalagan noted a systolic bruit at the left neck area. Tr. 317. He assessed Plaintiff with cervical arthritis, rule out carotid artery stenosis, and prescribed Naproxen. Tr. 317. A carotid ultrasound, performed on October 27, 2006, revealed no significant plaque or stenosis on the right, but mild to moderate mixed calcified and noncalcified plaque in the left internal carotid artery at the bifurcation. Tr. 318. A progress note dated December 18, 2006, states that Plaintiff's neck pain improved with the use of Naproxen. Tr. 327.

On October 23, 2006, Plaintiff went to a follow-up appointment following laser grid surgery on his left eye in January 2006. Tr. 319. There was no evidence of hemorrhages or edema in Plaintiff's right eye, but his left eye contained scattered dot hemorrhages. Tr. 319. However, Plaintiff's vision was "good" and no further intervention was necessary other than routine follow-up appointments for his diabetic retinopathy. Tr. 319.

As of November 1, 2006, Plaintiff's medications consisted of antacid tablets, Lisinopril, Metformin, Lasix, Lovastatin, Furosemide, and Aspirin. Tr. 324. On December 22, 2006, Plaintiff had x-rays of his chest taken, which were normal and revealed no active infiltrate. Tr. 328. X-rays of the lumbar spine revealed small anterior osteophytes in the lower thoracic and lower lumbar spine and vascular calcifications indicative of atherosclerotic disease in the aorta. Tr. 328-329. However, vertebral body height and intervertebral disc spaces were well-preserved and no subluxations were noted. Tr. 329. Plaintiff was later placed on Pentoxifylline to improve his blood flow. Tr. 329.

On August 14, 2007, Plaintiff saw Stanley L. Reyenga, M.D., for a consultative physical evaluation. Tr. 369-375. At this time, Plaintiff was taking Novalog insulin injections, but no other medications. Tr. 369. Visually, Dr. Reyenga noted neurovascularization in both of Plaintiff's eyes,

but normal confrontational fields. Tr. 371. Dr. Reyenga estimated total hearing loss in Plaintiff's right ear. Tr. 371. Plaintiff had full range of motion in his cervical and lumbar spine, with no muscle spasms and negative straight-leg raising tests. Tr. 372. He also exhibited full range of motion in his shoulders, elbows, wrists, hands, hips, right knee, and right ankle, with no evidence of synovitis. Tr. 372. Plaintiff's reflexes were intact, with the exception of his right achilles region. Tr. 373. Dr. Reyenga found no muscle weakness or atrophy, but noted abnormal proprioception. Tr. 373. Plaintiff's limb function was within normal limits, although he could not stand and walk without assistive devices (wheelchair, left leg prosthetic, cane), walk on his heels and toes, or squat and arise from a squatting position. Tr. 373. A pulse could not be detected in the dorsalis pedis and posterior tibial arteries of Plaintiff's right leg. Tr. 374. Dr. Reyenga assessed Plaintiff with insulin-dependent diabetes mellitus, diabetic retinopathy, diabetic neuropathy, amputation of the left leg below the knee, peripheral vascular disease, and bilateral hearing loss. Tr. 375.

On November 8, 2007, William Collie, an agency specialist, completed a Physical Residual Functional Capacity ("RFC") Assessment, in which he found that Plaintiff could occasionally lift/carry twenty pounds, frequently lift/carry ten pounds, stand/walk/sit for a total of six hours in an eight-hour workday, and push/pull an unlimited amount, other than as shown for lift/carry. Tr. 483-489. Posturally, Collie found that Plaintiff could occasionally crawl and climb ramps, stairs, ladders, ropes, and scaffolds. Tr. 484. Additionally, he found no manipulative, visual, or environmental limitations, but noted that Plaintiff had limited hearing. Tr. 485-486. He projected that Plaintiff could perform medium work as of the date last insured. Tr. 489.

Between September and December 2007, Plaintiff underwent several right foot surgeries due to gangrenous ulcers and complications from peripheral vascular disease, ultimately resulting in

amputation below the right knee.  Tr. 517-585.  Following surgery, Plaintiff developed an MSRA infection, for which he was treated with antibiotics.  Tr. 519-521, 536, 562-563.

### III.     Applicable Law

The Court's role on review is to determine whether the Commissioner's findings are supported by substantial evidence in the record as a whole.  *Ramirez v. Barnhart*, 292 F.3d 576, 583 (8th Cir. 2003).  "Substantial evidence is less than a preponderance, but enough so that a reasonable mind might accept it as adequate to support a conclusion."  *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002) (quoting *Johnson v. Apfel*, 240 F.3d 1145, 1147 (8th Cir. 2001)).  In determining whether evidence is substantial, the Court considers both evidence that detracts from the Commissioner's decision as well as evidence that supports it.  *Craig v. Apfel*, 212 F.3d 433, 435-36 (8th Cir. 2000) (citing *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000)).  If, after conducting this review, "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the [Secretary's] findings," then the decision must be affirmed.  *Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007) (quoting *Siemers v. Shalala*, 47 F.3d 299, 301 (8th Cir. 1995)).

To be eligible for disability insurance benefits, a claimant has the burden of establishing that he is unable to engage in any substantial gainful activity due to a medically determinable physical or mental impairment that has lasted, or can be expected to last, for no less than twelve months.  *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); 42 U.S.C. § 423(d)(1)(A).  The Commissioner applies a five-step sequential evaluation process to all disability claims: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment that significantly limits his physical or mental ability to perform basic work activities; (3) whether the claimant has an impairment that meets or equals a disabling impairment listed in the

regulations; (4) whether the claimant has the RFC to perform his past relevant work; and (5) if the claimant cannot perform his past work, the burden of production then shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform given his age, education, and work experience. *Pearsall*, 274 F.3d at 1217; 20 C.F.R. § 404.1520(a), 416.920(a). If a claimant fails to meet the criteria at any step in the evaluation, the process ends and the claimant is deemed not disabled. *Eichelberger v. Barnhart*, 390 F.3d 584, 590-91 (8th Cir. 2004).

**IV.  Discussion**

At step one, the ALJ determined Plaintiff had not engaged in substantial gainful activity since July 10, 2006, the alleged onset date. Tr. 57. At step two, she found that Plaintiff suffers from Type II diabetes mellitus, below left knee amputation, and a hearing disorder, which were severe impairments under the Act. Tr. 57. At step three, the ALJ determined that Plaintiff's impairments, considered both singly and in combination, did not meet or medically equal a listed impairment. Tr. 57. At step four, she found that Plaintiff retained the RFC to perform sedentary work, except he could only climb ramps and stairs and crawl occasionally and could never climb ladders, ropes, or scaffolds. Tr. 57-60. Additionally, the ALJ found that Plaintiff would be restricted to limited telephone usage, could tolerate only moderate noise, and could have no interactive transactions. Tr. 57-60. Plaintiff could use a cane to assist in ambulation. Tr. 57. With these limitations, the ALJ found that Plaintiff could no longer perform any of his past relevant work. Tr. 60. However, with the aid of a vocational expert, she determined that there were jobs existing in significant numbers in the national economy that Plaintiff could perform, including representative occupations such as small production machine operator, of which there are 500,000 jobs nationally and 4,000 locally,

small products assembler, of which there are 140,000 jobs nationally and 3,500 locally, and production inspector, of which there are 36,000 jobs nationally and 800 locally. Tr. 60-61. Thus, at step five, the ALJ determined Plaintiff was not under a disability at any time from July 10, 2006, through December 31, 2006, his date last insured. Tr. 61.

Plaintiff contends that the ALJ erred by: (1) failing to consider all of the medical evidence; and (2) improperly determining his RFC. Pl.'s Br. 6-12, ECF No. 8.

    A.  <u>Medical Evidence</u>

Plaintiff asserts that the ALJ failed to properly consider all the relevant medical evidence. Pl.'s Br. 6-8. Specifically, Plaintiff argues that the ALJ should have discussed and considered the medical records documenting the various surgeries leading to his below right knee amputation and his 2007 audiological evaluation. *Id.* We disagree.

In order to receive disability insurance benefits, a claimant must establish disability before the expiration of his insured status. *Pyland v. Apfel*, 149 F.3d 873, 876 (8th Cir. 1998); 20 C.F.R. §§ 404.101, 404.131. "Evidence of a disability subsequent to the expiration of one's insured status can be relevant . . . in helping to elucidate a medical condition during the time for which benefits might be rewarded." *Id*. at 877 (citing *Fowler v. Bowen*, 866 F.2d 249, 252 (8th Cir. 1989)). However, evidence of a new condition not previously suffered from during the relevant time period cannot serve as a basis for disability. *See Milton v. Schweiker*, 669 F.2d 554, 555 n. 1 (8th Cir. 1982) (per curiam).

Plaintiff argues that the ALJ should have taken his right below knee amputation into account when determining his RFC. Pl.'s Br. 7. However, the relevant time period is from July 10, 2006, the alleged onset date, through December 31, 2006, the date last insured. Thus, although Plaintiff

*subsequently* underwent a right below knee amputation, this surgery took place in December 2007, nearly a year after his date last insured. Tr. 379-516; *Stephens v. Shalala,* 46 F.3d 37, 39 (8th Cir.1995) (per curiam) (requiring claimant to show she was disabled before date last insured); *see Long v. Chater*, 108 F.3d 185, 187 (8th Cir. 1997) (court will only consider the claimant's medical condition as of the date last insured). For this reason, the ALJ properly excluded the evidence relating to Plaintiff's below right knee amputation.

Similarly, we find no error in the ALJ's failure to discuss the 2007 audiological examination. Although Plaintiff's hearing loss was a progressive condition, the September 2007 audiological examination was performed well after the date last insured and did not significantly differ from the 2001 examination. Tr. 376-377, 589-590. At the hearing, Plaintiff testified that he had been wearing hearing aids since 1996 and they did not cause any work-related difficulties. Tr. 29. In 2001, Plaintiff was assessed with severe to profound mixed hearing loss in his right ear and severe mixed hearing loss in his left ear. Tr. 361. A hearing loss test revealed a SRT of 90 decibels in the right ear and 65 decibels in the left ear. Tr. 363. Dr. Marsh recommended a right stapedectomy to improve hearing loss in the right ear. Tr. 363. In 2007, Plaintiff's SRT was 100 decibels in the right ear and 75 decibels in the left ear, indicating profound mixed hearing loss in the right ear and moderately severe to severe mixed hearing loss in the left ear. Tr. 376. Dr. Baker also recommended a stapedectomy to improve Plaintiff's hearing and suggested new hearing aids. Tr. 377. Plaintiff's audiology records demonstrate that his hearing loss was severe at the time of the 2001 examination. Thus, the ALJ's decision not to discuss the 2007 examination, which took place nine months after the date last insured and did not significantly vary from the 2001 findings, was not erroneous.

B.  Plaintiff's RFC

Plaintiff argues that the ALJ erred in determining he could perform work at the sedentary level.[2]  Pl.'s Br. 8-12.  We disagree.  At the fourth step of the evaluation, a disability claimant has the burden of establishing her RFC. *Eichelberger*, 390 F.3d at 591; *Masterson v. Barnhart*, 363 F.3d 731, 737 (8th Cir. 2004).  A claimant's RFC is the most she can do despite her limitations.  20 C.F.R. § 404.1545(a)(1).  The ALJ determines a claimant's RFC based on "all relevant evidence, including medical records, observations of treating physicians and others, and the claimant's own descriptions of his or her limitations." *Masterson*, 363 F.3d at 737.  The Eighth Circuit has stated that "a claimant's residual functional capacity is a medical question." *Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir. 2001).  Thus, although the ALJ bears the primary responsibility for determining a claimant's RFC, there must be "some medical evidence" to support the ALJ's determination. *Eichelberger*, 390 F.3d at 591; *Dykes v. Apfel*, 223 F.3d 865, 867 (8th Cir 2000).

The ALJ properly considered and took into account Plaintiff's medical impairments when determining his RFC.  The medical evidence of record suggests that although Plaintiff had extensive hearing loss, he was capable of working for several years with the use of hearing aids.  Tr. 29; *See SSR* 85-15, 1985 WL 65857 (hearing impairments do not necessarily prevent communication, and differences in types of work may be compatible with various degrees of hearing loss).  Moreover, the ALJ specifically took into account Plaintiff's hearing loss when she determined that he was restricted to limited telephone usage, could tolerate only moderate noise, and could have no interactive transactions.  Tr. 57.

---

[2] Sedentary work involves lifting no more than ten pounds at a time and occasionally lifting or carrying articles like docket files, ledges, and small tools.  *See* 20 C.F.R. § 404.1567(a).  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. *Id.*  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. *Id.*

Additionally, although Plaintiff underwent a left below knee amputation in 2006, his stump healed properly and he was fitted for a prosthesis, which functioned well. Tr. 311, 313, 315. Plaintiff reported no pains or pressures in the socket. Tr. 311. Additionally, he testified that he was able to ambulate effectively with the assistance of a cane, although he had trouble standing for long periods of time. Tr. 25, 35. In her RFC assessment, the ALJ limited Plaintiff to sedentary work where he could crawl and climb ramps and stairs occasionally and never climb ladders, ropes, or scaffolds. Tr. 57. Although sedentary work often requires a certain amount of walking and standing, there is no evidence that Plaintiff was incapable of performing these tasks as of the date last insured. Any physical restrictions placed on Plaintiff were temporary in nature and intended to acclimate him to the use of his prosthesis. Tr. 313-314. Moreover, Plaintiff testified that he was able to stand and walk with the use of a cane. Tr. 24-25, 35. For these reasons, we find no error in the ALJ's RFC determination.

Plaintiff contends that since he was placed on a "medically unable to work list" while in prison, he should be automatically deemed "disabled" under the Act. Pl.'s Br. 10. This argument has no merit. The standards for determining work ability in the Missouri prison system are distinct from the rules governing social security disability. *See* 20 C.F.R. § 404.1504 (a determination made by another agency that a claimant is disabled is not binding on the Commissioner). Thus, although Plaintiff's prison work status is a factor to be considered, it is by no means dispositive as to the issue of disability.

Lastly, Plaintiff asserts that the ALJ should have considered the fact that he subsequently suffered a stroke in 2008, lived in a "nursing home" for one month, and later resided in a handicap-accessible apartment. Pl.'s Br. 11. As already discussed, these events took place in 2008, well after

the date last insured. Thus, the ALJ did not err in failing to consider these factors.

None of Plaintiff's medical records support his contention that he was totally disabled during the relevant time period. *See Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005) ("[t]he burden of persuasion to prove disability and to demonstrate RFC remains on the claimant"). Significantly, no physician, treating or otherwise, opined that Plaintiff was unable to work. *See Raney v. Barnhart*, 396 F.3d 1007, 1010 (8th Cir. 2005) (none of the claimant's treating physicians opined that she was unable to work). Furthermore, Plaintiff largely relies on medical evidence outside the relevant time period to support his disability claim. After considering all the relevant evidence, we conclude that substantial evidence supports the ALJ's RFC determination. *Roberts v. Apfel,* 222 F.3d 466, 469 (8th Cir. 2000) (ALJ bears the primary responsibility for assessing a claimant's residual functional capacity based on all relevant evidence).

Plaintiff's remaining arguments are conclusory and lack proper development. Plaintiff makes cursory mention of the ALJ's credibility analysis. Pl.'s Br. 10. Here, the ALJ cited the proper standard, considered the factors in conjunction with Plaintiff's testimony, and then properly discounted his subjective complaints based on the objective medical evidence and Plaintiff's daily activities. *Gates v. Astrue*, 627 F.3d 1080, 1082 (8th Cir. 2010) ("we defer to an ALJ's credibility determinations if they are supported by valid reasons and substantial evidence"). Plaintiff also briefly asserts that the ALJ failed to fully develop the record because she did not request his work records from the Missouri Department of Corrections. Pl.'s Br. 11. However, Plaintiff cites no authority for this contention, nor is it a persuasive argument. When questioned at the administrative hearing, Plaintiff's counsel responded that there were no outstanding records. Tr. 22. For these reasons, Plaintiff's remaining arguments lack merit.

**V.    Conclusion**

Accordingly, having carefully reviewed the record, the undersigned finds that substantial evidence supports the ALJ's decision, and recommends that the decision be affirmed, and Plaintiff's case be dismissed with prejudice.  **The parties have fourteen days from receipt of our Report and Recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1),** *amended by* **Pub. L. 111-16, §§ 6(1), 7, 123 Stat. 1607, 1608-09 (2009).  The failure to file timely objections may result in waiver of the right to appeal questions of fact.  The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 29th day of April 2011.

*/s/ J. Marschewski*
HON. JAMES R. MARSCHEWSKI
CHIEF U.S. MAGISTRATE JUDGE